

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS
## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Department of Agriculture
State of Texas
Austin, Texas

Gentlemen:

Attention: Mr. W. S. Bussey

Opinion No. O-2404
Re: Whether livestock commis-
sion companies and stock-
yards operating in Texas
under the Federal Packers
and Stockyards Act, and
their employees, are sub-
ject to the statutes of
Texas in the particulars
discussed.

We are pleased to reply to your letter of recent date requesting the opinion of this department touching matters described by you as follows:

"It has come to our attention that there are numerous stockyards and livestock commission companies in the State of Texas which are operating under the 'Packers and Stockyards Act' which is administered by the Agricultural Marketing Service of the United States Department of Agriculture, and we would appreciate your advising this Department whether or not the employees of a company operating under the above mentioned Act are exempt from the requirements of the Texas laws governing public weighers. In other words, if an employee of a company, such as is described above, is performing duties definitely placing him within the definition of a 'public weigher,' should he be required to make Bond and secure a Certificate of Authority and have his scale inspected, tested, and certified, as required by the state law.

NO COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

Department of Agriculture, page 2

"You will also please advise whether or not the
Weights & Measures Division of the State Department
of Agriculture has supervision of weights and weighing
equipment of these companies operating under the
'Packers and Stockyards Act' the same as in other
commercial establishments, bearing in mind that much
of the business transacted by these companies is
intra-state commerce while some of their transactions
probably involve inter-state commerce."

In Opinion No. 0-73, by this department, we held that
any person engaged in the public weighing of livestock for hire
or any person who weighs cattle or livestock and issues weight
certificates or weight sheets upon which reliance is to be placed
for accurate weight, are public weighers within the purview of
Art. 5680, et seq., Revised Civil Statutes of Texas, and are
accordingly required to comply with the regulatory provisions of
these statutes.

We assume that the employees described in your letter
weigh livestock for hire or weigh livestock and issue weight
certificates or weight sheets upon which reliance is to be
placed for accurate weight, and, therefore are within the de-
finition of a public weigher set out in our Opinion No. 0-73,
referred to.

The first question posed by you in this connection is
whether or not the employees of stockyards and livestock commis-
sion companies in Texas which operate under the Federal Packers
and Stockyards Act, and which perform such weighing services,
are subject to the regulatory provisions of the statutes of Texas
pertaining to public weighers.

You further ask if these companies are subject to the
statutes of Texas pertaining to weights and weighing equipment
and therefore under the supervision of your department in the
manner provided for in such statutes.

To demonstrate the purpose, scope and application of
the Packers and Stockyards Act (USCA, Title 7), we quote the
following of its provisions:

Section 183:

"For the purpose of this chapter (but not in any
wise limiting the definition in the preceding section)

Department of Agriculture, page 3

a transaction in respect to any article shall be considered to be in commerce if such article is part of that current of commerce usual in the livestock and meat-packing industries, whereby livestock, meats, meat food products, livestock products, dairy products, poultry, poultry products, or eggs, are sent from one State with the expectation that they will end their transit, after purchase, in another, including, in addition to cases within the above general description, all cases where purchase or sale is either for shipment to another State, or for slaughter of livestock within the State and the shipment outside the State of the products resulting from such slaughter. Articles normally in such current of commerce shall not be considered out of such current through resort being had to any means or device intended to remove transactions in respect thereto from the provisions of this chapter. For the purpose of this section the word 'State' includes Territory, the District of Columbia, possession of the United States, and foreign nation."

Section 201:

"Stockyard owner," "stockyard services;" "market agency;" "dealer;" defined

"When used in this chapter -

"(a) The term 'stockyard owner' means any person engaged in the business of conducting or operating a stockyard;

"(b) The term 'Stockyard services' means services or facilities furnished at a stockyard in connection with the receiving, buying or selling on a commission basis or otherwise, marketing, feeding, watering, holding, delivery, shipment, weighing, or handling in commerce, of livestock;

"(c) The term 'market agency' means any person engaged in the business of (1) buying or selling in commerce livestock at a stockyard on a commission basis or (2) furnishing stockyard services; and

"(d) The term 'dealer' means any person, not a market agency, engaged in the business of buying or

Department of Agriculture, page 4

selling in commerce livestock at a stockyard, either on his own account or as the employee or agent of the vendor or purchaser."

Section 202:

"Stockyard defined; determination by Secretary as to particular yard

"(a) When used in sections 201 to 217, inclusive, of this chapter the term 'stockyard' means any place, establishment or facility commonly known as stockyards, conducted or operated for compensation or profit as a public market, consisting of pens, or other inclosures, and their appurtenances, in which live cattle, sheep, swine, horses, mules or goats are received, held, or kept for sale or shipment in commerce. Sections 201 to 217, inclusive, of this chapter shall not apply to a stockyard of which the area normally available for handling livestock, exclusive of runs, alleys or passage ways is less than twenty thousand square feet.

"(b) The Secretary shall from time to time ascertain, after such inquiry as he deems necessary, the stockyards which come within the foregoing definition, and shall give notice thereof to the stockyard owners concerned, and give public notice thereof by posting copies of such notice in the stockyard, and in such other manner as he may determine. After the giving of such notice to the stockyard owner and to the public, the stockyard shall remain subject to the provisions of sections 201 to 217, inclusive, of this chapter until like notice is given by the Secretary that such stockyard no longer comes within the foregoing definition."

Section 205:

"It shall be the duty of every stockyard owner and market agency to furnish upon reasonable request, without discrimination, reasonable stockyard services at such stockyard: Provided, That in any State where the weighing of livestock at a stockyard is conducted by a duly authorized department or agency of the State, the Secretary, upon application of such department, or agency, may register it as a market agency for the weighing of livestock received in such stockyard, and upon such registration such department or agency and the members thereof shall be amenable to all the requirements of this chapter; and upon failure of such

Department of Agriculture, page 5

department, or agency or the members thereof to comply
with the orders of the Secretary under this chapter
he is authorized to revoke the registration of such
department or agency and to enforce such revocation as
provided in section 216 of this title."

Section 205:

"It shall be the duty of every stockyard owner and
market agency to establish, observe and enforce just,
reasonable, and nondiscriminatory regulations and prac-
tices in respect to the furnishing of stockyard services,
and every unjust, unreasonable, or discriminatory re-
gulation or practice is prohibited and declared to be
unlawful."

Section 213:

"Prevention of unfair, discriminatory, or deceptive
practices

"(a) It shall be unlawful for any stockyard owner,
market agency, or dealer to engage in or use any unfair,
unjustly discriminatory, or deceptive practice or device
in connection with the receiving, marketing, buying,
or selling on a commission basis or otherwise, feeding,
watering, holding, delivery, shipment, weighing or
handling, in commerce at a stockyard, of livestock.

"(b) Whenever complaint is made to the Secretary
by any person, or whenever the Secretary has reason
to believe, that any stockyard owner, market agency,
or dealer is violating the provisions of subdivision
(a), the Secretary after notice and full hearing may
make an order that he shall cease and desist from con-
tinuing such violation to the extent that the Secretary
finds that it does or will exist."

The case of STAFFORD vs. WALLACE, 258 U. S. 495, in-
volved the constitutionality of the Packers and Stockyards Act.
The purpose and scope of this Act was described by Mr. Chief
Justice Taft in these words:

"The Packers and Stockyards Act of 1921 seeks to
regulate the business of the packers done in interstate
commerce and forbids them to engage in unfair, discrim-
inatory or deceptive practices in such commerce, or to
subject any person to unreasonable prejudice therein,
or to do any of a number of acts to control prices or

Department of Agriculture, page 6

establish a monopoly in the business. * * *

"The Act, therefore, treats the various stock-
yards of the country as great national public utili-
ties to promote the flow of commerce from the ranges
and farms of the West to the consumers in the East.
It assumes that they conduct a business affected by
a public use of a national character and subject to
national regulation. That it is a business within
the power of regulation by legislative action needs
no discussion. * * *"

In passing on the question of interstate commerce
in this case, Mr. Justice Taft draws the following distinc-
tion:

"Counsel for appellant cites cases to show that
transactions like those of the commission men or deal-
ers here are not interstate commerce within the power
of Congress to regulate. The chief of these are Hopkins
vs. U. S.,171 U. S. 578, and Anderson vs. U. S., 171 U.
S. 604. These cases were considered in the Swift case
and disposed of by the Court as follows: (p.397)'so,
again, the line is distinct between this case and Hop-
kins vs. U. S., 171 U. S. 578. All that was decided
there was that the local business of commission mer-
chants was not commerce among the states, even if what
the brokers were employed to sell was an object of such
commerce. The brokers were not like the defendants be-
fore us, themselves the buyers and sellers. They only
furnished certain facilities for the sales. Therefore,
there again the effects of the combination of brokers
upon the commerce was only indirect and not within
the Act.'"

Demonstrating another distinction, Mr. Justice Taft
quotes as follows from the case of Bacon vs. Illinois, 227 U.
S. 504:

"The question, it should be observed, is not with
respect to the extent of the power of Congress to re-
gulate interstate commerce, but whether a particular
exercise of state power in view of its nature and oper-
ation must be deemed to be in conflict with this para-
mount authority."

Finally, Mr. Justice Taft, concludes:

"As already noted, the word 'commerce' when used in the Act is defined to be interstate and foreign commerce. Its provisions are carefully drawn to apply only to those practices and obstructions which in the judgment of Congress are likely to affect interstate commerce prejudicially. Thus construed and applied, we think the Act clearly within Congressional Power and valid."

In the case of LEMKE vs. FARMERS GRAIN COMPANY, 258 U. S. 60, the United States Supreme Court considered a statute of the State of North Dakota, which required purchasers of grain to obtain a license and pay a license fee and to act under a defined system of grading, inspection and weighing, and subjecting the prices paid and the profits made to regulation. The majority of the Court, speaking through Mr. Justice Day, held that the business of the North Dakota Association involved in the case, including the buying of the grain in North Dakota by the Association, was interstate commerce, and thus the North Dakota statute was a direct burden on interstate commerce. The majority opinion announced the principle that even when the particular subject remained unregulated by Congress, a state cannot burden interstate commerce in the guise of police regulations to protect the welfare of her people. We quote as follows from the majority opinion wherein the case of Merchants Exchange vs. Missouri, 248 U. S. 365, was distinguished:

"Nor is the appellants' contention upheld by the decision of this court in Merchants Exchange v. Missouri, 248 U. S. 365. In that case this court sustained the constitutionality of a statute of Missouri providing that in cities having more than seventy-five thousand inhabitants buildings used for the storage of grain shall be deemed public warehouses; and prohibiting the issue of weight certificates by other than authorized bonded state weighers. We held that the state statute did not violate the due process clause or the interstate commerce clause of the Federal Constitution. Furthermore, it was held that the act, under the facts of that case, did not violate the United States Grain Standards Act, as the latter did not regulate weighing; and, for reasons stated, did not violate the United States Warehouse Act. The act, there in question, did not undertake to regulate the buying of grain in interstate commerce, nor to levy a license tax upon the privilege, nor to fix the profit which could

Department of Agriculture, page 8

be realized on grain bought, shipped and sold in
interstate commerce."

In a dissenting opinion by Mr. Justice Brandeis, con-
curred in by Mr. Justice Holmes and Mr. Justice Clarke, it is
said:

"Whether the purchases involved in this case
were intrastate or interstate commerce we need not
decide. For the facts that the sale or a purchase
is part of a transaction in interstate commerce does
not preclude application of state inspection laws,
unless Congress has occupied the field, or the state
regulations directly burden interstate commerce. That
neither of these exceptions applies here appears from
the description of the operation of Federal and State
Laws given below in the opinion of Judge Amidon.****"

It is thus seen that both the majority and minority
opinions in this case recognized the validity of state inspec-
tion laws unless Congress had occupied the field or unless
the state law directly burdens interstate commerce. The majority
was of the opinion that the business involved was interstate
commerce and that the North Dakota Statute directly burdened
it; whereas, the minority could perceive no burdening of inter-
state commerce by the statute.

The case of MERCHANTS EXCHANGE vs. MISSOURI, 248 U.
S. 365, distinguished by Mr. Justice Day in the Lemke case, supra,
involved a statute of Missouri relating to the inspection and
weighing of grain and declared that in cities of more than seventy-
five thousand inhabitants all buildings used for the storage or
transferring of grain of different owners, for a compensation,
shall be deemed public warehouses; and, prohibited under severe
penalties any person, corporation or association, other than a
duly authorized and bonded state weigher, to issue any weight
certificate for grain weighed at any warehouse or elevator in
this state.

Mr. Justice Brandeis in delivering the opinion of the
court declared:

"The regulation of weights and measures with a
view to preventing fraud and facilitating commercial

Department of Agriculture, page 9

transactions is an exercise of the police power.
* * * Section 63 does not violate the commerce
clause of the constitution. The contention that
it does was rested below solely on the ground
that the prohibition as applied to grain received
from or shipped to points without the State, bur-
dens interstate commerce. It clearly does not.
* * * But the additional contention is made here
that all state regulation of the weighing of grain
was superseded by the United States Grain Standards
Act approved August 11, 1916, (39 Sta.482). That
Act * * * relates exclusively to the establishment
by the Secretary of Agriculture of standards of
quality and condition. It does not in any way re-
fer to the weighing of grain. And part b of Chap-
ter 313 * * * makes manifest the purpose of Congress
not to supersede state laws for the inspection and
weighing of grain, but to cooperate with state of-
ficials charged with the enforcement of such state
laws. The Missouri Act is not superseded by or in
conflict with the Federal legislation."

The holding in this case on the proposition that the
Missouri act did not burden interstate commerce is quite analo-
gous to the situation at hand. There is, however, this dif-
ference between the Missouri Act and the U. S. Warehouse Act,
and the Texas Statutes and the Packers and Stockyards law;
The Packers and Stockyards law does refer, although no parti-
cular regulation with reference thereto is present, to the
weighing of livestock; moreover, there is nothing in the Packers
and Stockyards law which indicates any intent of Congress that
there shall be, under the Packers and Stockyards laws, co-
operation with the officials of any state pertaining to the
enforcement of any state regulations.

There was involved in the case of HOPKINS vs. U. S.,
171 U. S. 578, the Kansas City Livestock Exchange which was an
unincorporated volunteer association of men doing business at
its stockyard which consisted in receiving individually con-
signments of cattle, hogs, and other livestock from the owners
thereof, not only in the States of Missouri and Kansas, in each
of which the stockyard was located, but also in other states
and territories, and to feed such stock and to prepare it for
the market, to dispose of the same, to receive the proceeds
thereof from the purchasers, and to pay the owners their pro-
portion of such proceeds, after deducting charges, for expenses

Department of Agriculture, page 10

and advances. The court held that such business or occupation of the several members of the association was not interstate commerce and that the Sherman Anti-Trust Act did not cover, and was not intended to cover, any kind of agreement between those engaged in such occupation, notwithstanding such represented unlawful restraint and monopolies within the purview of the Sherman Anti-Trust Act. In delivering the opinion of the court, Mr. Justice Peckham. declared at pages 590,591, 592:

"The selling of an article at its destination, which has been sent from another State, while it may be regarded as an interstate sale and one which the importer was entitled to make, yet the services of the individual employed at the place where the article is sold are not so connected with the subject sold as to make them a portion of interstate commerce, and a combination in regard to the amount to be charged for such service is not, therefore, a combination in restraint of that trade or commerce. Granting that the cattle themselves, because coming from another State, are articles of interstate commerce, yet it does not therefore follow that before their sale all persons performing services in any way connected with them are themselves engaged in that commerce, or that their agreements among each other relative to the compensation to be charged for their services are void as agreements made in restraint of interstate trade. The commission agent in selling the cattle for their owner simply aids him in finding a market; but the facilities thus afforded the owner by the agent are not of such a nature as to thereby make that agent an individual engaged in interstate commerce, nor is his agreement with others engaged in the same business, as to the terms upon which they would provide these facilities, rendered void as a contract in restraint of that commerce. Even all agreements among buyers of cattle from other states are not necessarily a violation of the act, although such agreements may undoubtedly affect that commerce.

"The charges of the agent on account of his services are nothing more than charges for aids or facilities furnished the owner whereby his object may be the

Department of Agriculture, page 11

more easily and readily accomplished. Charges for the transportation of cattle between different States are charges for doing something which is one of the forms of and which itself constitutes interstate trade or commerce, while charges or commissions based upon services performed for the owner in effecting the sale of the cattle are not directly connected with, as forming part of, interstate commerce, although the cattle may have come from another State. Charges for services of this nature do not immediately touch or act upon nor do they directly affect the subject of the transportation. Indirectly and as an incident, they may enhance the cost to the owner of the cattle in finding a market, or they may add to the price paid by a purchaser, but they are not charges which are directly laid upon the article in the course of transportation, and which are charges upon the commerce itself; they are charges for the facilities given or provided the owner in the course of the movement from the home situs of the article to the place and point where it is sold."

Subsequently, the United States Supreme Court in the case of SWIFT AND COMPANY vs. U. S., 196 U. S. 375, held that a combination of a dominant proportion of the dealers in fresh meat throughout the United States, in a manner condemned by the Sherman Anti-Trust Act, was within the meaning thereof, for the reason that when cattle are sent from a place in one state, with the expectation that they will end their transit, after purchase, in another state, and when in effect they do so, with only the interruption necessary to find a purchaser at the stockyard, this being a constantly recurring course, it constitutes interstate commerce. In holding this combination to be within the condemnation of the Sherman Anti-Trust Act, the court distinguished the Hopkins vs. U. S. case, supra, as follows:

"So, again, the line is distinct between this case and Hopkins vs. U. S. ,171 U. S. 578. All that was decided there was that the local business of commission merchants was not commerce among the states, even if one of the brokers was employed to sell was an object of such commerce. The brokers were not like the defendants before us, themselves the buyers and sellers. They only furnished certain facilities for the sale. Therefore, there again the effects of the combination of brokers upon the commerce was only indirect and not within the Act."

Department of Agriculture, page 12

Finally, we emphasize the analysis by Mr. Chief Justice Taft in the Stafford Case, of the true purpose and scope of the Packers and Stockyards Laws. At pages 514 and 515, the opinion reads:

"The chief evil feared is the monopoly of the packers, enabling them unduly and arbitrarily to lower prices to the shipper who sells, and unduly and arbitrarily to increase the price to the consumer who buys. Congress thought that the power to maintain this monopoly was aided by control of the stockyards. Another evil which is sought to provide against by the act, was exorbitant charges, duplication of commissions, deceptive practices in respect of prices, in the passage of the livestock through the stockyards, all made possible by collusion between the stockyards management and the commission men, on the one hand, and the packers and dealers on the other. Expenses incurred in the passage through the stockyards necessarily reduce the price received by the shipper, and increase the price to be paid by the consumer. If they be exorbitant or unreasonable, they are an undue burden on the commerce which the stockyards are intended to facilitate. Any unjust or deceptive practice or combination that unduly and directly enhances them is an unjust obstruction to that commerce. The shipper whose live stock are being cared for and sold in the stockyards market is ordinarily not present at the sale, but is far away in the West. He is wholly dependent on the commission men. The packers and their agents and the dealers who are the buyers, are at the elbow of the commission men, and their relations are constant and close. The control that the packers have had in the stockyards by reason of ownership and constant use, the relation of landlord and tenant between the stockyards owner, on the one hand, and the commission men and the dealers, on the other, the power of assignment of pens and other facilities by that owner to commission men and dealers, all create a situation full of opportunity and temptation to the prejudice of the absent shipper and owner in the neglect of the live stock, in the mala fides of the sale, in the exorbitant prices obtained, in the unreasonableness of the charges for services rendered."_

Department of Agriculture, page 13

Analyzing these decisions by the United States Supreme Court, we may therefore arrive at the following conclusions:

The local business of livestock commission companies, merchants, dealers or brokers, is not interstate commerce; this was recognized and reaffirmed in the Swift case and by Mr. Justice Taft in the Stafford case, the latter upholding the constitutionality of the Packers and Stockyards Act;

The sustaining of the constitutionality of the Packers and Stockyards Act in the Stafford case was premised upon the proposition that its provisions apply only to practices affecting interstate commerce prejudicially;

The regulation of weights to prevent fraud or inaccuracy is a valid exercise of the police power of the State and does not burden interstate commerce merely because the products involved may be received from or shipped to points without the State;

The application of State regulatory laws enacted under the police power is not precluded unless such laws burden interstate commerce or unless Congress has occupied the field.

It is our considered opinion that the application of the Statutes of Texas pertaining to weights and weighing equipment, and to public weighers, to the business of stockyards in Texas involving weighing transactions and to the business of livestock commission companies in Texas, will not burden interstate commerce. Therefore, such stockyards and commission companies, and their employees, are subject to these statutes provided that Congress has not occupied such field of legislation in the enactment of the Packers and Stockyards Act.

The inclusion of a reference to weighing in the Packers and Stockyards Act does not represent, in our opinion, an attempt to, or an actual occupation of, this field of legislation. Assuming that Congress may occupy such field, as applied to Texas livestock commission companies and stockyards, which we do not concede, we are unable to perceive wherein the application of the Texas statutes relating to weighing

—

Department of Agriculture, page 14

would conflict with the paramount authority represented by the Packers and Stockyards Law. That act contains no provision as to the inspection and supervision of the weights and weighing equipment used, no method whereby the accuracy and honesty of the weighing equipment may be ascertained, and no procedure analogous to that of the Texas statutes, whereby the owner and the seller of the livestock may have recourse against a dishonest or inaccurate weigher. The only protection therefrom under the Packers and Stockyards Act lies in an appeal to the Secretary of Agriculture, with no method provided whereby this official may know whether or not the weighing has been honest and accurate. The impracticability of protection or recourse against dishonest or inaccurate weighing in this manner is obvious when the great number of individual weighing transactions are considered. Consequently, we are unwilling to believe, and to hold, that the Packers and Stockyards Act was designed to, or does, represent an occupation by the Federal government of the field of legislation pertaining to public weighers and to weights and measures, which would render inapplicable the laws of Texas on this important subject.

Assuming, therefore, that the employees of livestock commission companies and stockyards in Texas perform services definitely placing them within the definition of a public weigher and hence subject to the regulatory provisions of the applicable statutes of Texas, you are respectfully advised that it is the opinion of this department that such employees are subject thereto, notwithstanding their employers may come within, and may operate under, the Packers and Stockyards Act.

It is likewise our opinion, in answer to your second question, that such companies are subject to the statutes of Texas, and to such supervision by your Department as authorized thereby, pertaining to weights and weighing equipment.

APPROVED JUL 16, 1940

FIRST ASSISTANT
ATTORNEY GENERAL

Very truly yours

ATTORNEY GENERAL OF TEXAS

By Zollie C. Steakley
Assistant

ZCS:EP

APPROVED
OPINION
COMMITTEE
BY
CHAIRMAN